UNITED STATES DISTRICT COURT
DISTRICT OF CONNECTICUT

| | |
|---|---|
| BRIAN COOPER, | : |
|       Plaintiff, | : |
| v. | :   No. 3:09cv691 (MRK) |
| CONNECTICUT DEPARTMENT OF CORRECTIONS, | : |
|       Defendant. | : |

**RULING AND ORDER**

In this case, Plaintiff Brian Cooper alleges that his employer, the Connecticut Department of Corrections, retaliated against him for engaging in various activities that were protected under Title VII of the Civil Rights Act of 1964. *See* 42 U.S.C. § 2000e-3(a). Mr. Cooper – who is Jewish – suffered from back injuries while employed with the Department and spent several years on workers' compensation. While Mr. Cooper was away on workers' compensation, a co-worker drew and circulated a cartoon of Mr. Cooper wearing a yarmulke and placing a bag of ice on his back. Mr. Cooper complained that the cartoon was anti-Semitic; the Department eventually punished the co-worker for violating the Department's internal anti-discrimination policy. However, Mr. Cooper believed that the punishment was not sufficiently harsh. Mr. Cooper complained about the extent of the punishment. Thereafter, he was forced to take paid administrative leave for two months and to undergo a series of tests regarding his fitness to return to work.

Pending before the Court is the Department's Motion for Summary Judgment [doc. #40]. In support of the motion, the Department argues that Mr. Cooper's placement on paid administrative leave was not an adverse employment action. For the reasons set forth below, the Court agrees, and the Department's Motion for Summary Judgment [doc. # 40] is GRANTED.

**I.**

The Court sets forth the facts of this case at some length, even though they are straightforward and for the most part undisputed. As it must at the summary judgment stage, the Court resolves all ambiguities and draws all inferences from the evidence in favor of Mr. Cooper, the nonmoving party here. *See Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986); *Tabbaa v. Chertoff*, 509 F.3d 89, 92 (2d Cir. 2007).

Mr. Cooper has been a Commissary Officer with the Department of Corrections since July 2000. From May 2005 through August 2007, Mr. Cooper was away from work and on workers' compensation while recovering from spinal fusion surgery. During the summer of 2006, John Witt, a co-worker of Mr. Cooper, draw a cartoon depicting Mr. Cooper wearing a yarmulke, holding a fishing rod, and placing a bag of ice on his back. Mr. Witt circulated copies of the drawing to several of his co-workers, including to Mr. Cooper's friend Mary Salerno. Ms. Salerno took a copy of the drawing home from work and gave it to Mr. Cooper.

Mr. Cooper filed a internal complaint against Mr. Witt with the Department's Affirmative Action Unit. In the internal complaint, Mr. Cooper alleged that the cartoon was anti-Semitic.[1] The Affirmative Action Unit conducted an investigation to determine whether Mr. Witt's conduct violated any Department policies. On May 31, 2007, the Affirmative Action Unit determined that Mr. Witt's conduct violated the Department's religious discrimination policy. On July 19, 2007, the Department suspended Mr. Witt for five days without pay for violating the policy.

Mr. Cooper returned to work after recovering from his spinal fusion surgery in August 2007.

---

[1] Mr. Cooper's internal complaint also accused other co-workers of making anti-Semitic statements, but only the allegations against Mr. Witt are relevant to this case. Regarding Mr. Witt, the internal complaint focused solely on the allegedly anti-Semitic cartoon.

On Friday, August 10, 2007, Deborah Ennis, the Department's Fiscal Administrative Manager, received a phone call from the Human Resources Department requesting that she return a call from Mr. Cooper. Ms. Ennis tried to call Mr. Cooper on his cell phone and at the Commissary the same day, but was unable to reach him.[2] On Monday, August 13, 2007, Ms. Ennis called Mr. Cooper at the Commissary. Mr. Cooper told Ms. Ennis that he was upset about the punishment Mr. Witt had received, and that he was looking into his available legal remedies. Ms. Ennis told Mr. Cooper that if he was unhappy in his workplace, there was a vacancy at one of the Department's other Commissary facilities. Mr. Cooper told Ms. Ennis he did not want to transfer to another facility.

Ms. Ennis filled out an incident report about her conversation with Mr. Cooper later that day. The Court reproduces the relevant portions of Ms. Ennis' report here:

> On Monday, 8/13/07, at approximately 8:15 AM, I called the District 2 Commissary Warehouse and asked to speak with Mr. Cooper. When he came on the line, I identified myself and he apologized for not returning my call from Friday. He then went on to tell me that he was having a very difficult time working in the Commissary Warehouse. He stated several times that he was "very tightly wound" and "extremely depressed." Went on to say that "I know that they are setting me up and they are going to try to take me down." I asked him who he was referring to as "they" and [he] stated that he has no friends here. He then went on to say that he has had "extensive weapons training" and that he was a former Correction Officer in Virginia.
>
> Mr. Cooper then referred to a recent Affirmative Action complaint he had filed. The outcome of the investigation resulted in a co-worker (Commissary Operator) being suspended for 5 days. Mr. Cooper stated that he found that "appalling" and it did not demonstrate a zero tolerance on behalf of the Department.
>
> I asked him if any of the Commissary staff were treating him badly or in an unprofessional manner. He stated he was "watching his back at all times, I'm very tightly wound right now and extremely paranoid." I mentioned to him that I

---

[2] Though Mr. Cooper and Ms. Ennis recall the conversation very differently, the Court must credit Mr. Cooper's account of the call since he is the nonmoving party. *See Anderson*, 477 U.S. at 255.

> currently have a Commissary Operator vacancy in District 3 (Niantic) and he stated that he could not do the commute due to childcare issues.
>
> He then mentioned that he has applied for a position at [the Connecticut Department of Children and Families] and is praying to God that he gets it and gets out of [the Department of Corrections]. I ended the call by giving him my direct phone number at Central Office and told him to call me if he has any issues or concerns.
>
> I then discussed the situation with Director [of Fiscal Services Robert] Foltz and Assistant [Human Resources] Director Tracey Butler.

Incident Report, Ex. 6 to Def.'s Mot. for Summary J. [doc. # 40-5] at 20-21. Mr. Folz reviewed the report the same day and wrote the following note on it: "[Fiscal Administrative Manager] Ennis reported the above situation to me on the morning of August 13. I recommended consulting with HR Asst. Director Butler, which she did (as noted) and completed this [Incident Report]." *Id.* at 22.

When Daniel Callahan, the Director of Human Resources, learned about Ms. Ennis' phone call with Mr. Cooper, he decided to place Mr. Cooper on paid administrative leave. *See* Callahan Aff., Ex. 7 to Def.'s Mot. for Summary J. [doc. # 40-5] at 29. Mr. Cooper's Collective Bargaining Unit Contract provided that the Department could place him on leave "pending an investigation of alleged action that constitutes grounds for dismissal." Collective Bargaining Unit Contract, Ex. 8 to Def.'s Mot. for Summary J. [doc. # 40-6] at 5. On August 14, 2010, Mr. Cooper was escorted out of the Commissary, and his keys to the Commissary were taken away from him. He was immediately placed on administrative leave pending the results of an investigation into his fitness to continue working for the Department. While Mr. Cooper was on administrative leave, he continued to collect the same salary and was not demoted. During the leave, Mr. Cooper was required to undergo a number of tests of his fitness to remain in his current position. He remained on leave pending the outcome of the tests until October 2007.

On October 15, 2007, Mr. Cooper filed a discrimination complaint against the Department

4

with the Connecticut Commission on Human Rights and Opportunities ("CHRO"). In his claim, he alleged that on August 6, 2007 – exactly one week before his phone call with Ms. Ennis – he asked Laurel Robinson, his supervisor and the Lead Commissary Officer, for permission to take a day off to attend an appointment with the CHRO to file a complaint. He further alleged that Ms. Robinson "questioned" the request. Aff. of Illegal Discriminatory Practice, Ex. 3 to Def.'s Mot. for Summary J. [doc. # 40-5] at 6. He further alleged that – at some point before August 2007 – he had "helped a co-worker Mary Ann Salerno when she filed a CHRO complaint against" the Department. *Id.* He did not, however, allege that he told anyone else at the Department that he assisted Ms. Salerno. Mr. Cooper claimed that the Department placed him on paid administrative leave as retaliation for his assisting Ms. Salerno with her CHRO complaint and telling Ms. Robinson that he intended to file a CHRO complaint. Mr. Cooper's CHRO complaint was eventually denied.

In October 2007 – around the same time he filed his CHRO complaint – Mr. Cooper was allowed to return to his job at the Department. Mr. Cooper does not allege in this case that his responsibilities were changed in any way, nor is there any evidence that they changed in any way. He remained at work until January 2008. In January 2008, Mr. Cooper again left work because of his back injuries. He has been out of work and on workers' compensation ever since.

Mr. Cooper filed his Complaint [doc. # 1] in this Court on April 28, 2009. Mr. Cooper's Complaint asserts a Title VII retaliation claim, *see* 42 U.S.C. § 2000e-3(a), as well as two Connecticut law claims. *See* Conn. Gen. Stat. §§ 46a-58 and -60. On May 3, 2010, Defendant filed the pending Motion for Summary Judgment [doc. # 40] pursuant to Rule 56(b) of the *Federal Rules of Civil Procedure* on May 3, 2010. Mr. Cooper filed a Memorandum in Opposition [doc. # 44] to the motion on July 5, 2010. The Court held oral argument on the motion on September 9, 2010.

5

**II.**

The standard of review this Court must apply when reviewing a motion for summary judgment pursuant to Rule 56 is a familiar one. Summary judgment is appropriate only when "the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c). "A dispute regarding a material fact is genuine if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Williams v. Utica Coll. of Syracuse Univ.*, 453 F.3d 112, 116 (2d Cir. 2006) (quotation marks omitted). "The substantive law governing the case will identify those facts that are material, and '[o]nly disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment.'" *Bouboulis v. Transp. Workers Union of Am.*, 442 F.3d 55, 59 (2d Cir. 2006) (quoting *Anderson*, 477 U.S. at 248).

The moving party bears the burden of demonstrating that no genuine issue exists as to any material fact, *see Celotex Corp. v. Catrett*, 477 U.S. 317, 323-25 (1986), and the Court must resolve all ambiguities and draw all inferences in favor of the nonmoving party. *See Anderson*, 477 U.S. at 255; *Holcomb v. Iona Coll.*, 521 F.3d 130, 137 (2d Cir. 2008). If the moving party carries its burden, the party opposing summary judgment "may not rely merely on allegations or denials." Fed. R. Civ. P. 56(e)(2). Rather, the opposing party must "set out specific facts showing a genuine issue for trial." *Id.* In short, the nonmoving party "must do more than simply show that there is some metaphysical doubt as to the material facts." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986). "If the evidence is merely colorable, or is not significantly probative, summary judgment may be granted." *Anderson*, 477 U.S. at 249-50 (citations omitted).

**III.**

As a preliminary matter, the Department argues in support of the pending motion that all of Mr. Cooper's claims are barred by the Eleventh Amendment. Absent waiver by a State or valid abrogation by Congress, the Eleventh Amendment bars any damages action against a State in federal court. *See Kentucky v. Graham*, 473 U.S. 159, 169 (1985). By enacting Title VII, Congress abrogated the States' Eleventh Amendment immunity. *See Fitzpatrick v. Bitzer*, 427 U.S. 445, 452 (1976) ("[I]n [a] Title VII case, the 'threshold fact of congressional authorization' to sue the State as employer is clearly present." (citation omitted)). Thus, the Eleventh Amendment does not bar Mr. Cooper's Title VII claim against the Department.

Although Mr. Cooper opposes summary judgment on his Title VII retaliation claim, he concedes that his "claim under the Connecticut Fair Employment Practice[s] Act is barred by sovereign immunity." *See* Pl.'s Mem. in Opp. [doc. # 44] at 1. Mr. Cooper's Complaint actually asserts *two* claims under the Connecticut Fair Employment Practices Act. *See* Conn. Gen. Stat. §§ 46a-58 and -60. The Court assumes that Mr. Cooper desires to withdraw both of those claims without prejudice. Both claims are dismissed without prejudice to their refiling in state court.

**IV.**

Because the Court dismisses Mr. Cooper's state law claims without prejudice, the only remaining claim is a claim under Title VII's anti-retaliation provision. *See* 42 U.S.C. § 2000e-3(a). Section 2000e-3(a) forbids employer actions that "discriminate against" an employee because he or she has "opposed" a practice forbidden under Title VII or "made a charge, testified, assisted, or participated in" a Title VII "investigation, proceeding, or hearing." *Id.*; *see Burlington N. & Santa Fe Ry. Co. v. White*, 548 U.S. 53, 59 (2006). Claims under § 2000e-3(a) are governed by a variation

7

of the familiar burden shifting framework established by the Supreme Court in *McDonnell Douglas Corp v. Green*, 411 U.S. 792, 802-04 (1973). *See, e.g.*, *Terry v. Ashcroft*, 336 F.3d 128, 140-41 (2d Cir. 2003); *O'Neill v. City of Bridgeport*, --- F. Supp. 2d ----, 2010 WL 2220579, at *8 (D. Conn. 2010). To make out a prima facie case under § 2000e-3(a), a plaintiff must produce evidence (1) that he or she participated in a protective activity; (2) that his or her participation in the activity was known to the defendant; (3) that his or her employer took a materially adverse action against him or her; and (4) that there was a causal connection between the protected activity and the adverse employment action.³ *See Kessler v. Westchester Cnty. Dep't of Soc. Servs.*, 461 F.3d 199, 205-06 (2d Cir. 2006). If the plaintiff makes out a prima facie case under § 2000e-3(a), the burden of persuasion shifts to the defendant. *See Cifra v. Gen. Elec. Co.*, 252 F.3d 205, 216 (2d Cir. 2001). The defendant must produce "evidence of a legitimate, nonretaliatory reason for the challenged employment action." *Id.* Lastly, if the defendant is able to point to evidence of a legitimate, nonretaliatory reason for the challenged employment action, the plaintiff must point to some evidence that would be sufficient to permit a rational factfinder to conclude that the employer's explanation is merely a pretext for impermissible retaliation. *See id.*

     In this case, the Court concludes that at least one of Mr. Cooper's three allegedly protected activities was protected under § 2000e-3(a). However, the Court has serious doubts about whether Mr. Cooper has produced sufficient evidence regarding the other three elements of the prima facie

---

³ The Second Circuit sometimes articulates three, rather than four, elements of the prima facie case under § 2000e-3(a). *See, e.g.*, *Richardson v. Comm. on Human Rights & Opportunities*, 532 F.3d 114, 123 (2d Cir. 2008) ("As we have explained, '[t]o establish a prima facie case of retaliation, an employee must show [1] participation in a protected activity known to the defendant; [2] an employment action disadvantaging the plaintiff; and [3] a causal connection between the protected activity and the adverse employment action.'" (citation omitted)).

case. The Court doubts that Mr. Cooper has introduced sufficient evidence to demonstrate that the Department had knowledge of any of his allegedly protected activities, or that there was a causal connection between those activities and his placement on paid administrative leave. However, the Court need not resolve this case on either of those two grounds. Under the Second Circuit's decision in *Joseph v. Leavitt*, 465 F.3d 87 (2d Cir. 2006), Mr. Cooper's placement on paid administrative leave pending the conclusion of an internal investigation was not an adverse employment action. *See id.* at 91.

**A.**

The Court first considers whether Mr. Cooper engaged in any activity that was protected under § 2000e-3(a) before he was placed on paid administrative leave. Two different categories of activity are protected under § 2000e-3(a): "oppos[ing] any practice made an unlawful employment practice by" Title VII and "ma[king] a charge, testify[ing], assist[ing], or participat[ing] in any manner in an investigation, proceeding, or hearing under" Title VII. 42 U.S.C. § 2000e-3(a). Mr. Cooper argues that he participated in three different protected activities before the Department placed him on paid administrative leave.[4] First, he argues that he engaged in a protected activity when he "informed . . . [Ms. Robinson] of his intent to file a CHRO complaint" on August 6, 2007. *Id.* at 5. Second, he argues that he engaged in a protected activity when he "stated that he intended to pursue legal action" to Ms. Ennis on August 13, 2007. *Id.* at 3. Third, he argues that he engaged in a protected activity when he "assisted" Ms. Salerno in filing a CHRO complaint. Pl.'s Mem. in

---

[4] Although Mr. Cooper points out that he was placed on leave after he "protested the inadequate response of the Defendant to the conduct of [Mr. Witt]" to Ms. Ennis on August 13, 2007, Pl.'s Mem. in Opp. [doc. # 44] at 3, he does not argue that such protestation alone was a protected activity.

9

Opp. [doc. # 44] at 4.

The Court concludes that Mr. Cooper engaged in a protected activity when he informed Ms. Robinson on August 6, 2007 of his intent to file a discrimination complaint with the CHRO. "Ma[king] a charge, testify[ing], assist[ing], [and] participat[ing]" in a Title VII proceeding are all protected activities. 42 U.S.C. § 2000e-3(a). The Second Circuit has held that communicating one's intent to engage in any of those activities can itself be a protected activity. *See Jute v. Hamilton Sundstrand Corp.*, 420 F.3d 166, 175 (2d Cir. 2005) ("[T]he record indicates that [the employee] planned to testify [in a Title VII proceeding] . . . . [T]here exists indirect evidence that this intention was communicated to [the employer]. . . . [The employee] was removed . . . just one day after being named as a . . . witness." (citations omitted)). Mr. Cooper claims that he told Ms. Robinson during their conversation on August 6, 2007 that he "had an appointment with CHRO . . . to file a discrimination complaint." Aff. of Illegal Discriminatory Practice, Ex. 3 to Def.'s Mot. for Summary J. [doc. # 40-5] at 6. The Court believes that the evidence in the record shows that Mr. Cooper actually planned to make a Title VII charge against the Department, and that his statement to Ms. Robinson evinced his intent to make a such a charge. Mr. Cooper therefore engaged in a protected activity when he made his statement to Ms. Robinson.

The Court doubts that Mr. Cooper engaged in a protected activity when he informed Ms. Ennis on August 13, 2007 that he was exploring his legal options. According to his own deposition testimony, Mr. Cooper told Ms. Ennis: "I'm not sure what other avenues are open to me, you know, legally, but I would look into it." Cooper Dep., Ex. 1 to Pl.'s Local Rule 56(a)(2) Statement [doc. # 43-1] at 3. That statement did not evince an intent to file a Title VII charge. In fact, it did not even make clear whether he was exploring his legal options against Mr. Witt directly, against the

10

Department for its failure to punish Mr. Witt sufficiently, or against both. The Court believes that *Jute* likely requires a more specific statement of intent than the one Mr. Cooper made to Ms. Ennis. Nevertheless, the Court assumes for the sake of argument that Mr. Cooper engaged in a protected activity when he made his statement to Ms. Ennis.

The Court also doubts that Mr. Cooper engaged in protected activity when he assisted Ms. Salerno with filing her CHRO complaint. Mr. Cooper correctly points out that "assist[ing] . . . in an investigation, proceeding, or hearing under" under Title VII is a protected activity. 42 U.S.C. § 2000e-3(a). But Mr. Cooper has not provided the Court with any specific evidence about Ms. Salerno's CHRO complaint. No evidence has been presented about the substance of Ms. Salerno's complaint against the Department; about when Ms. Salerno filed her complaint against the Department was filed; or about how Mr. Cooper assisted Ms. Salerno. Most significantly, he has not introduced any evidence to demonstrate that Ms. Salerno's complaint alleged discrimination *in violation of Title VII*. Title VII protects against discrimination on the basis of race, color, religion, sex, and national origin only. *See* 42 U.S.C. § 2000e-2. The CHRO is authorized to hear claims based on a number of additional classifications that are made impermissible under state law, including age, marital status, mental disability, learning disability, physical disability, *see* Conn. Gen. Stat. § 46a-60, and sexual orientation. *See id.* § 46a-81c. The Court is thus unable to determine whether Mr. Cooper's assistance of Ms. Salerno was a protected activity. Nevertheless, the Court assumes for the sake of argument that it was a protected activity.

**B.**

Before turning to the ground upon which the Court ultimately resolves the pending motion – whether Mr. Cooper suffered an adverse employment action – the Court notes that it would likely

grant summary judgment for the Department even if Mr. Cooper had suffered an adverse employment action. A plaintiff cannot make out a prima facie case under § 2000e-3(a) unless he or she can prove that the defendant *knew* he engaged in protected activity, and that his or her adverse employment action was *causally related* to that protected activity. *See Richardson*, 532 F.3d at 123; *Kessler*, 461 F.3d at 205-06. The Court doubts that the evidence Mr. Cooper has introduced here sufficiently demonstrates either knowledge or a causal relationship, although the Court ultimately need not reach either issue.

To satisfy the knowledge requirement, a plaintiff need only show that the employing entity had general knowledge that the plaintiff engaged in a protected activity. *See Gordon v. New York City Bd. of Educ.*, 616 F.3d 134, 116 (2d Cir. 2000). For example, in *Cosgrove v. Sears, Roebuck & Co.*, 9 F.3d 1033 (2d Cir. 1993), the knowledge requirement was satisfied because the Equal Employment Opportunity Commission mailed a copy of the plaintiff's complaint to the Sears corporation. *See id.* at 1037; *see also Patane v. Clark*, 508 F.3d 106, 116 (2d Cir. 2007) (reasoning that an employer had general knowledge of the plaintiff's complaint because the plaintiff complained to the employee "whose job it was to investigate and resolve . . . complaints"); *Kessler*, 461 F.3d at 210 (2d Cir. 2006) (reasoning that a government employer "[p]lainly" knew of the plaintiff's complaint because it made submissions to a state agency opposing the complaint); *Reed v. A.W. Lawrence & Co., Inc.*, 95 F.3d 1170, 1178 (2d Cir. 1996) ("[B]y complaining to an officer of the company . . . and maintaining her complaint during [a] subsequent internal investigation of the matter, the plaintiff was in effect communicating her concerns . . . to [the company]."). Here, the Court doubts there is any basis for imputing to the Department Ms. Salerno's knowledge that Mr. Cooper helped her file a CHRO complaint, Ms. Ennis's knowledge that Mr. Cooper was exploring

his legal options, or Ms. Robinson's knowledge that Mr. Cooper intended to file a CHRO complaint. None was a principal or officer of the Department, *see Reed*, 95 F.3d at 1178, and it does not appear that any was responsible for handling discrimination complaints. *See Patane*, 508 F.3d at 116. Ms. Robinson was apparently Mr. Cooper's supervisor within the Commissary staff, and Mr. Ennis was apparently responsible for financial matters. Mr. Cooper has provided no details about Ms. Salerno's position within the Department. Further, there is no evidence that any of the three told anyone else at the Department about Mr. Cooper's interactions with them. Although the Department had an Affirmative Action Unit – the unit that investigated Mr. Cooper's complaint against Mr. Witt – there is no evidence that Mr. Cooper told the Affirmative Action Unit about his intention to pursue a claim against the Department or about his past assistance of Ms. Salerno.

If the Department did not have generalized knowledge about Mr. Cooper's activities, the evidence Mr. Cooper has introduced may not be sufficient evidence to show a causal connection between his activities and his allegedly adverse employment action. The Second Circuit has twice held that in order to show causation, a plaintiff need not necessarily show that the person who carried out the adverse employment action knew about the plaintiff's protected activity, so long as the employing entity had general corporate knowledge of the protected activity. *See Henry v. Wyeth Pharm., Inc.*, 616 F.3d 134, 148 (2d Cir. 2010); *Gordon*, 232 F.3d at 117. But in both of those cases, the Court indicated that the lower-level agent who actually carried out the adverse employment action may have acted pursuant to the encouragement of a superior who *did* have personal knowledge of the employee's protected activity. *See Henry*, 616 F.3d at 148; *Gordon*, 232 F.3d at 117.

The facts of this case are the converse of the facts the Second Circuit confronted in *Henry*

13

and *Gordon*. In those cases, the Second Circuit indicated that a principal's knowledge could be attributed down to agents acting under that principal's explicit or implicit orders or directions. Here, the evidence shows only that lower-level employees knew about Mr. Cooper's activities. Under ordinary circumstances, "[c]lose temporal proximity between the plaintiff's protected action and the employer's adverse employment action may in itself be sufficient to establish the requisite causal connection between a protected activity and [an adverse employment] action," *Kaytor v. Elec. Boat Corp.*, 609 F.3d 537, 552 (2d Cir. 2010), but the Court doubts that causation should be inferred based solely on temporal proximity under the circumstances presented here.

## C.

Because at least one of Mr. Cooper's activities was protected under § 2000e-3(a), the Court must reach the issue of whether Mr. Cooper suffered an adverse employment action. In the Title VII retaliation context, "[a] plaintiff sustains an adverse employment action if he or she endures a 'materially adverse change' in the terms and conditions of employment." *Galabya v. New York City Bd. of Educ.*, 202 F.3d 636, 640 (2d Cir. 2000); *see Burlington N. & Santa Fe Ry.*, 548 U.S. at 57 ("We . . . conclude that [§ 2000e-3(a)] covers those (and only those) employer actions that would have been materially adverse to a reasonable employee . . . ."). A materially adverse change is one that "is more disruptive than a mere inconvenience or an alteration of job responsibilities." *Galabya*, 202 F.3d at 640. "Examples of materially adverse changes include 'termination of employment, a demotion evidenced by a decrease in wage or salary, a less distinguished title, a material loss of benefits, significantly diminished material responsibilities, or other indices . . . unique to a particular situation.'" *Terry*, 336 F.3d at 138 (citation omitted).

Mr. Cooper argues that he suffered an adverse employment action when the Department

14

placed him on paid administrative leave for two months pending the outcome of an internal inquiry into his fitness for duty. Mr. Cooper does not argue that the duration of the leave was too long, or that the extent of the inquiry into his fitness for duty was inappropriate. His only argument is that the Department's initial decision to place him on leave and to have him escorted out of his workplace was an adverse employment action. The Department claims that it decided to place Mr. Cooper on leave based on Ms. Ennis' report, according to which Mr. Cooper made statements that might well be considered threats or warnings of violence. *See* Incident Report, Ex. 6 to Def.'s Mot. for Summary J. [doc. # 40-5] at 20-21 ("He then went on to say that he has had 'extensive weapons training' . . . . He stated he was 'watching his back at all times, I'm very tightly wound right now and extremely paranoid.'"). According to the Department, those statements were grounds for placement on paid leave under Mr. Cooper's Collective Bargaining Unit Contract. *See* Collective Bargaining Unit Contract, Ex. 8 to Def.'s Mot. for Summary J. [doc. # 40-6] at 5 (stating that an employee could be placed on paid leave "pending an investigation of alleged action that constitutes grounds for dismissal").

The Second Circuit has never considered whether placement on leave pending the sort of internal inquiry that is at issue in this case can ever rise to the level of an adverse employment action. The Second Circuit has, however, held that placing an employee on paid administrative leave with pay during an internal investigation into an employee's alleged misconduct cannot constitute an adverse employment action when there are also pending *criminal charges* against the employee. *See Joseph v. Leavitt*, 465 F.3d 87, 91 (2d Cir. 2006). The Second Circuit noted in *Joseph* that four Circuits before it had held more generally that placement on paid administrative leave with pay pending the outcome of an internal investigation cannot constitute an adverse

15

employment action. *See id.* at 90-91. Because the case before the Second Circuit involved pending criminal charges, the Second Circuit declined to join those other Circuits' more sweepings holdings. *See id.* at 90-91.

The Second Circuit did, however, state in dicta that "an employee does not suffer a materially adverse change in the terms and conditions of employment where the employer merely enforces its preexisting disciplinary policies in a reasonable manner." *Id.* at 91. The Court believes that the *Joseph* standard constitutes a "judicial dictum" – that is, a dictum that was "obviously designed to guide . . . district court[s]." *See Velazquez v. Legal Servs. Corp.*, 349 F. Supp. 2d 566, 600 (E.D.N.Y. 2004). Thus, while it is not binding on this Court, it must be given considerable weight. *See United States v. Bell*, 524 F.2d 202, 206 (2d Cir. 1975). Other district courts in the Second Circuit seem to agree; no less than thirteen have cited and followed the *Joseph* standard since 2006. *See, e.g.*, *Clayton v. City of Middletown*, 564 F. Supp. 2d 105, 113-14 (D. Conn. 2008) (applying the *Joseph* standard and concluding that placement on paid administrative leave pending an internal investigation was not an adverse employment action).

Applying the *Joseph* standard here, the Court concludes that the Department's decision to place Mr. Cooper on paid administrative leave pending an inquiry into his fitness to remain in his position was a reasonable enforcement of a preexisting disciplinary policy. Mr. Cooper's Collective Bargaining Unit Contract provided that the Department had the authority to place him on leave pending an investigation of any alleged action that, if verified, would constitute grounds for dismissal. *See* Collective Bargaining Unit Contract, Ex. 8 to Def.'s Mot. for Summary J. [doc. # 40-6] at 5. Mr. Cooper apparently does not contest that threats or warnings of violence against co-workers could constitute grounds for dismissal. Given the security concerns that are always present

16

in a prison, it is not surprising that such threats could constitute grounds for dismissal of a prison commissary worker. The Court believes that it was reasonable for Mr. Callahan – the person responsible for the decision to place Mr. Cooper on paid leave – to conclude based on the facts known to him at the time that Mr. Cooper may have threatened violence against his co-workers during the phone call with Ms. Ennis. The Court believes that it was reasonable for Mr. Callahan to place Mr. Cooper on leave and to begin an internal inquiry in response to Ms. Ennis' incident report, and that Mr. Cooper's placement on leave did not constitute an adverse employment action.

The Court's conclusion that Mr. Cooper's placement on leave was a *reasonable* application of a preexisting disciplinary policy is bolstered by the fact that Mr. Cooper was only placed on leave for two months. When the inquiry into Mr. Cooper's fitness to remain on duty ended, Mr. Cooper was allowed to return to his position immediately, and he suffered no changes in his status at the Department. Mr. Cooper does not argue that the length of the leave period was excessive, nor does he argue that the tests the Department required him to undergo were in any way out of the ordinary. Under such circumstances, the Court concludes that *Joseph* bars a Title VII retaliation claim. *See* 465 F.3d 91; *Clayton* 564 F. Supp. 2d at 113-14.

**IV.**

In sum, the Court concludes that Mr. Cooper cannot make out a prima facie case under § 2000e-3(a) because under *Joseph*, his placement on paid leave did not constitute an adverse employment action. *See* 465 F.3d 91. Mr. Cooper's state law claims are dismissed without prejudice to renewal. If Mr. Cooper wishes, he may pursue those claims in state court. The Department's Motion for Summary Judgment [doc. # 40] is therefore GRANTED. **The Clerk is directed to enter judgment for the Department on Mr. Cooper's Title VII retaliation claim and to close this file.**

17

IT IS SO ORDERED.

/s/      Mark R. Kravitz
United States District Judge

Dated at New Haven, Connecticut: **October 19, 2010.**